UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ARKADY MALAKHOV,

Defendant.

Case # 22-CR-6093

DECISION AND ORDER

## INTRODUCTION

On November 21, 2024, Defendant Arkady Malakhov pleaded guilty, pursuant to a plea agreement, to a misdemeanor information alleging a violation of 18 U.S.C. § 641. ECF Nos. 137, 138, 140. Because the parties could not agree on the proper calculations for guideline loss and restitution, the plea agreement left those issues unresolved. *See* ECF No. 138 at 3-4, 8-11. Additional briefing followed, and the Court has now reviewed the materials filed by Probation, the government, and Defendant. In order to fully explain its reasoning, the Court has decided to issue this Decision & Order in advance of the sentencing hearing on the issues of guidelines loss and restitution. All other sentencing matters will be resolved orally at the hearing. For the reasons set forth below, the Court intends to adopt the recommendations in the Presentence Investigation Report that (a) Defendant's offense is subject to a ten-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(F); and (b) Defendant must be ordered to pay $200,000 in restitution to the National Science Foundation ("NSF"). *See* ECF No. 145 at 11.

## DISCUSSION

### I.    Loss Calculation

"Under U.S.S.G. § 2B1.1(b)(1), the base offense level for various crimes resulting in financial loss is enhanced based on the amount of loss." *United States v. Lacey*, 699 F.3d 710, 713 (2d Cir. 2012). Loss "is the greater of actual loss or intended loss," intended loss being "the pecuniary

1

harm that was intended to result from the offense," and actual loss being "the reasonably foreseeable pecuniary harm that resulted from the offense." *United States v. Skys*, 637 F.3d 146, 153 (2d Cir. 2011) (emphases omitted). Per the commentary, a special rule applies in a case involving "government benefits" like "grants":

> In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1, Application Note 3(E)(ii).

The parties dispute the proper loss calculation under this standard. The government and Probation calculate the loss as $200,000—the total amount of grants that Defendant obtained prior to the performance of the work. *See* ECF No. 142 at 2-3; ECF No. 145 at 26. Defendant counters that, as substantiated by his expert, there was no loss because he ultimately performed "over $200,000 worth of research and development," ECF No. 143 at 15; ECF No. 143-1, such the government received the full benefit of the bargain. *See* ECF No. 148 at 3. The Court agrees with Probation and the government.

The case of *United States v. Agrawal*, 97 F.4th 421 (6th Cir. 2024), is helpful. There, as here, the Sixth Circuit was tasked with evaluating loss relating to fraud in connection with the SBIR grant program. *See Agrawal*, 97 F.4th at 426. The court analyzed the application note in assessing the loss calculation, distinguishing between unintended *recipients* and unintended *uses*. An example of the former would be "an ineligible disability-benefits applicant [who] falsely claims to be unemployed (an eligibility requirement for some disability benefits)." *Id.* at 437. In that scenario, "the loss will equal the full amount of benefits [received] because the applicant should have 'obtained' nothing." *Id.* By contrast, "if a welfare recipient lies about her income to obtain

$150 worth of food stamps (rather than the $100 to which her income legally entitles her), the loss will equal the portion 'diverted' to the unintended use (the $50 worth of excess food stamps)." *Id.*

Ultimately, however, the Sixth Circuit recognized that the issue should not be conceptualized too formalistically. "[B]oth the 'unintended recipient' and the 'unintended use' scenarios require a district court to engage in the same basic inquiry. The court should calculate the 'net loss' by subtracting the amount that the recipient *would have received* from the government if it had known of the fraud from the amount the recipient *actually received* from the government." *Id.* Thus, "[w]hen an unqualified recipient would have received no grant at all if the government had known of the fraud, the 'net loss' equals the total amount of the grant." *Id.*

Applying this framework, the Court calculates the applicable loss amount as $200,000. The relevant facts are undisputed.[1] As Defendant himself admits:

> [Defendant] committed the crime of unlawful conversion because at the time he withdrew $200,000 in grant funds, he certified that the identified Principal Investigator (P.I.), Dr. Yuriy Lobunets was available and authorized to work on the project. However, at that time, Dr. Lobunets was still awaiting the receipt of his visa and authorization to travel to and work in the United States. Dr. Lobunets did not arrive in the United States until several months after [Defendant] signed the certification and the grand [sic] funds were withdrawn. . . . . The crime [Defendant] committed was withdrawing the money before Dr. Lobunets' arrival and using that money for expenses unrelated to the NSF grant project.

ECF No. 148 at 1-2. In other words, Defendant concedes that he falsely certified Dr. Lobunets's availability to work, which induced the NSF to disburse $200,000 in grant funds from July 2017 to September 2017. *See* ECF No. 138 at 2-3. Defendant does not dispute that, during that time period, he should not have received, and was not entitled to, those funds. *See* ECF No. 143 at 9, 12, 15-16; *see also* ECF No. 135 at 27-33, 47.

---

[1] Because the Court can resolve the parties' dispute solely by reference to the undisputed facts, it need not address Defendant's objections regarding the government's expert report. *See* ECF No. 143 at 9-13.

3

Given these concessions, the loss is properly calculated as $200,000 because Defendant would not have received *any* of the grants had he honestly disclosed Dr. Lobunets's unavailability (or had the NSF known of Defendant's fraudulent certification). Because the NSF would have declined to disburse any grant funds during that period, the "improper payments" that Defendant received from July 2017 through September 2017 equaled "the total grant." *Agrawal*, 97 F.4th at 438.

It is immaterial, as Defendant suggests, that he proffered no fraudulent information in his original grant application. *See* ECF No. 148 at 2. There are no facts in the record to suggest that Defendant's initial enrollment into the SBIR program, standing alone, gave him an *entitlement* to the full amount of the grant; rather, Defendant remained subject to a series of ongoing requirements that constituted conditions on his entitlement to those funds. One of those conditions was that, at the time of disbursement, the Principal Investigator must be available to perform the proposed work. *See* ECF No. 136 at 2, 6. The fact that Defendant satisfied some antecedent bureaucratic hurdles for an SBIR grant does not alter his ineligibility for the grant funds at the time he requested, received, and spent them. *Cf. United States v. Torlai*, 728 F.3d 932, 941 (9th Cir. 2012) (even assuming that defendant had a valid crop insurance policy, finding that he fraudulently claimed a loss and therefore was entitled to none of the indemnity proceeds he received).

Relying on the expert report of Jenna Voss, Defendant also asserts that any loss attributable to his fraud is fully offset by his "good faith performance [of the research project] within the award period." ECF No. 148 at 3; *see also* ECF No. 143-1 at 19 (Report of Jenna Voss) (concluding that Defendant's company incurred $232,976 in total costs to "deliver on the Project"). The Court disagrees. As an initial matter, Defendant does not proffer any evidence to suggest that the NSF *received* anything of value from his research—like patent rights, a marketable product, or even

4

economically useful scientific knowledge.  His argument is simply that his company incurred legitimate expenses to conduct the research he promised to perform.

For purposes of calculating loss, courts have rejected the notion that such expenses constitute "services rendered" to the victim.  SBIR grants are not mere "job programs for unemployed scientists," through which research is funded "for the sake of research." *United States v. Aldissi*, 758 F. App'x 694, 702 (11th Cir. 2018) (summary order).  They are intended to "foster small business and research projects" that satisfy "the *program['s] requirements* and objectives for commercial promise." *Id.* (emphasis added).  By taking grant funds at a time when he was not eligible to receive them, and using them for ineligible purposes, Defendant undermined the purposes of the grants.  This is true even though it can also be acknowledged that Defendant's later actions were arguably consistent with one of the broad aims of the SBIR program—the undertaking of scientific research.[2]  *See United States v. Davis*, 53 F.4th 833, 849-50 (5th Cir. 2022) (declining to reduce loss caused by trade school's fraudulent receipt of VA tuition payments to account the educational benefits that the school provided to students, since "regardless of any educational benefit [the school's] students might have received, the VA itself, as the victim, would not have paid for anything absent [the school's] fraudulent misrepresentations"); *see also Agrawal*, 97 F.4th at 441 (rejecting the claim that defendant should have been credited for her "legitimate expenses" in connection with SBIR-grant fraud).

---

[2] The Court's rejection of Defendant's argument for purposes of calculating loss under the sentencing guidelines should not be understood to mean that Defendant's post-fraud conduct is irrelevant for other sentencing purposes.  To the contrary, the fact that Defendant ultimately undertook the research he promised to perform may bear significantly on the Court's consideration of the § 3553(a) factors, and Defendant should not feel deterred from relying on such arguments at the sentencing hearing.

Accordingly, the Court is persuaded, in light of the undisputed facts, that a loss amount of $200,000 is appropriate.  Therefore, consistent with the Presentence Investigation Report, the offense level must be increased by 10.  *See* U.S.S.G. § 2B1.1(b)(1)(F); ECF No. 145 at 11.

## II.    Restitution

Defendant concedes that the Mandatory Victims Restitution Act ("MVRA") requires this Court to impose an order of restitution for his offense.  *See* ECF No. 143 at 17; 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii); *see also United States v. Ekanem*, 383 F.3d 40, 42-43 (2d Cir. 2004).  Nevertheless, he asserts that (1) the NSF did not suffer any actual loss, and (2) regardless, restitution must be capped at $1,000.

The former argument fails for the reasons stated above.  "The MVRA requires defendants convicted of fraud offenses . . . to make restitution to those directly and proximately harmed as a result of the commission of [the] offense[s]."  *United States v. Rahmankulov*, No. 20-CR-653, 2025 WL 326495, at *4 (S.D.N.Y. Jan. 28, 2025) (internal quotation marks omitted).  "[A] court's power to order restitution is limited to *actual* loss."  *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013).  Though guideline loss and restitution are calculated under different standards, *see Agrawal*, 97 F.4th at 441-42, in this case the same figure is appropriate.  Defendant converted $200,000 in grant funds to which he had no present entitlement.  As a result, the actual loss to NSF was the $200,000 "it was fraudulently induced to pay."  *Davis*, 53 F.4th at 850.  And while the MVRA contemplates credits on losses, *see, e.g.*, *United States v. Stevens*, 657 F. App'x 69, 72 (2d Cir. 2016) (summary order), in this case there is no evidence that the NSF received anything of value from Defendant's fraud.  As stated above, given the nature of the SBIR program, the expenses associated with Defendant's research do not constitute value to the NSF.  *See Davis*, 53 F.4th at 850; *United States v. Jha*, 613 F. App'x 212, 215 (4th Cir. 2015) (summary order)

(rejecting defendant's theory that the NSF sustained no actual loss because the defendant produced "technical research reports" with the fraudulently obtained grant money). Accordingly, restitution in the amount of $200,000 to the NSF must be ordered, with no credit for the expenses that Defendant incurred when he later performed the promised research.

Defendant's latter argument merits more discussion. The Supreme Court has held that an award of restitution is generally limited to "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990) (where defendant pleaded guilty to one count of use of an unauthorized credit card, restitution limited to losses caused by the use of that one credit card, despite the fact that there was evidence that defendant had used at least 15 other cards in connection with his scheme). Based on *Hughey*, some district courts have held that where a defendant is convicted of a misdemeanor lesser-included offense of a felony, the restitution order must be equally limited regardless of the actual losses. *See United States v. Mingo Lamar*, 295 F. Supp. 3d 376, 380-81 (S.D.N.Y. 2018) (where defendant pleaded guilty to misdemeanor bank fraud, which requires theft of money "not exceeding $1,000 in value," defendant could not be ordered to pay restitution "in an amount greater than the amount as to which he was criminally [convicted]," despite evidence that defendant in fact caused losses over $15,000); *United States v. Payne*, No. 09-MJ-517, 2009 WL 5062099, at *2 (S.D. Ohio Dec. 16, 2009) ("By definition, [Defendant's misdemeanor conviction under Section 641] cannot involve a theft of government property in an amount in excess of $1,000. It would be hard to conclude that restitution in any amount greater than $1,000 would be compensating the government for losses caused by the misdemeanor offense described in the Information.").

Relying on this case law, Defendant contends that any restitution order cannot exceed $1,000. *See* ECF No. 143 at 18. Because he pleaded guilty to a misdemeanor information alleging

a violation of Section 641—which applies where the value of the fraudulently converted property "does not exceed the sum of $1,000," 18 U.S.C. § 641—he asserts that "the loss amount, by definition, could not exceed $1,000."  ECF No. 143 at 18.

The Court is not persuaded by this argument.  The underlying assumption of Defendant's view is that a misdemeanor violation necessarily contemplates a finding that the property at issue was worthy no more than $1,000.  But that is not the case.  To prove a violation of Section 641, "the government is required to prove four essential elements: (1) stealing or converting, (2) with intent to steal or convert, (3) a 'thing of value' (4) that belongs to the government."  *United States v. Lee*, 833 F.3d 56, 65 (2d Cir. 2016).  Importantly, "[i]f the government at trial proves all four of the above elements—including that the 'thing' stolen had some value—any value, even if small— it has proven a violation of § 641.  Proof that the 'thing' simply had *some value*, without proof that the value exceeded $1,000, would show a complete crime upon the fewest facts—a misdemeanor." *Id.* (emphasis added).  It is only where there is an additional finding—that "the value of the 'thing' is shown . . . to have been in excess of $1,000"—that "the government has proven a felony."  *Id.*

In other words, all that was required for Defendant's plea was a concession that the fraudulently obtained grants had *some* value.  There was no express or implied finding of the grants' precise value.  As a result, there is no logical inconsistency between (a) Defendant's admission that the grants had *some* value, for purposes of his plea to a misdemeanor violation of Section 641, and (b) the Court's finding that the grants had $200,000 in value, for purposes of restitution.  The district-court cases on which Defendant relies rest on the incorrect premise that a misdemeanor violation necessarily entails some finding as to the precise value of the property.  *See Mingo*, 295 F. Supp. 3d at 381 (suggesting that a misdemeanor violation of Section 641 is "limited

in monetary scope"); *Payne*, 2009 WL 5062099, at *3 ("By definition, that [misdemeanor] offense cannot involve a theft of government property in an amount in excess of $1,000.").

In short, the Court rejects Defendant's argument that his plea to a misdemeanor violation of Section 641 caps restitution at $1,000.  Rather, consistent with the MVRA, the Court orders Defendant to pay $200,000 in restitution to the NSF.

## CONCLUSION

For the foregoing reasons, the Court intends to adopt the recommendations in the Presentence Investigation Report that (a) Defendant's offense is subject to a ten-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(F); and (b) Defendant must be ordered to pay $200,000 in restitution to the National Science Foundation.  *See* ECF No. 145 at 11.

IT IS SO ORDERED.

Dated:  April 29, 2025
        Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York